## Haizlett v. Farm Bureau Mutual Automobile Insurance Company, Appellant.

Argued April 22, 1952. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and GUNTHER, JJ. (ARNOLD, J., absent).

*Stuart A. Culbertson,* for appellant.

*Kenneth W. Rice,* for appellee.

OPINION BY ROSS, J., October 1, 1952:

This action of assumpsit on a written contract of burglary and robbery insurance was brought to recover the value of articles stolen and for damage to the premises of plaintiff's service station. The jury returned a verdict for plaintiff, and after its motions for a new trial and judgment n.o.v. were discharged by the court below, the defendant took this appeal.

The parties entered into the contract in question in June 1944, at which time plaintiff was engaged in business as proprietor of a gasoline and oil service station in Cochranton, Crawford County. Because of war shortages of tires and other materials normally incident to the auto supply business, plaintiff also carried for sale a line of fishing tackles, guns and other sports equipment.

On the night of August 23, 1944, plaintiff and his wife, after checking to see that the windows were closed, locked up the service station and drove to their home. The next morning, upon his return to the station, plaintiff noticed that certain equipment was missing from its usual place and upon this discovery he called in Frank Murdock, the local constable, who was at that time in the vicinity and on his way to work. On the latter's advice, based on the theory that the then-scarce equipment might more readily be recovered and the thief apprehended if public knowledge of a burglary were withheld, plaintiff did not then call the state police, but did notify defendant's local representative Shaffer, through whom the contract of insurance had been consummated. On August 26 a representative of the defendant came to the station and, after talking with the plaintiff and one of his employes, filled out a proof of loss which the plaintiff executed. The verdict of the jury establishes the fact of the burglary and the amount of the plaintiff's loss.

A clause of the policy provided: "B. . . . The Company shall not be liable for loss of or damage to any property unless books and accounts are kept by the Insured in such manner that the Company can accurately determine therefrom the amount of loss or damage. . . ." Another paragraph indemnified against burglary "which shall mean the felonious abstraction of such property from within such premises, by any per-

son or persons making felonious entry therein by actual force and violence when the premises are not open for business, of which force and violence there shall be visible marks made upon the exterior of the premises at the place of such entry, by tools, explosives, electricity or chemicals." The defendant denied liability and bases this appeal upon the contention that the plaintiff did not comply with either of these provisions in the policy.

Defendant bases its argument that the plaintiff did not comply with the provision of the policy relative to "books and accounts" upon (1) a material variance between the itemized list of articles as contained in the proof of loss executed on August 26 and an itemized list attached to the statement of claim when suit was brought on May 3, 1945, and (2) the plaintiff's failure to bring his books and records into court when the case was on trial.

Referring to the proof of loss executed on August 26, the plaintiff stated that the list was incomplete— a "hit and miss proposition"—and so understood by the adjuster, because "He came in on a Saturday morning. We were busy. I told him, 'If you want to come down to my house on a Sunday we can sit down go through and I can give you a correct list of everything,' and he never did that. He never asked me to do that. . . . We didn't have our books at the station. . . . Our books were home. . . . It was only a partial list. It was a list that he wanted to check with the police so we gave him, as near as we could, a partial list of what we knew had been taken up to that time before we checked through our records." In view of this uncontradicted testimony, we do not ascribe much importance to the variance in the lists. Moreover, any discrepancies or contradictions in the itemized lists or in any other testimony were for the jury, and they by

their verdict resolved all conflicts in favor of the plaintiff.

This case was tried on April 10, 1950, after the plaintiff had sold his business and more than five years after the burglary. The plaintiff did not bring with him into court any of the books and records which he had kept and the defendant argues that this establishes that no books of account were kept. However, we cannot agree with this contention. In the absence of a subpoena he was under no obligation to bring his books and records into court since there was no provision of the contract requiring him to do so. The contract provided: "The Insured *upon request of the Company* shall render every assistance in his power to facilitate the investigation and adjustment of any claim, exhibiting for that purpose any and all books, papers and vouchers bearing in any way upon the claim made . . ." (Italics supplied.) Both the plaintiff and his wife testified that defendant's representatives made no request for an examination of the books and records, the plaintiff testifying that they "never asked to see the records at all". Mrs. Haizlett testified that they did not ask her to inspect the records, and that she was never requested to turn over to the defendant the records for any purpose.

In *Sirhan v. Liberty Mutual Ins. Co.*, 362 Pa. 195, 66 A. 2d 831, cited by the defendant, the policy provided that the insurer was not liable for loss or damage "unless records are kept by the insured in such manner that the company can accurately determine therefrom the amount of loss or damage. . . ." In a suit brought on the policy to recover for the loss of rugs which had been stolen, the insurance company defended on the ground that the plaintiff had not complied with this provision of the policy. The plaintiff elected to bring into court his "records" to show com-

pliance with the provision. However, the sole record produced was a book from which the first 22 pages were missing, containing only the number of each rug, type of rug, size and cost price. As new rugs were acquired they were added to the end of the list, and when a rug was sold it was eliminated from the record by crossing it off. In holding that the plaintiff had not shown compliance with the provision of the policy, the Supreme Court stated at page 198: "Plaintiff produced no receipts, vouchers, bills of lading or invoices. He had no checks covering specifically any of the rugs which were stolen and his book did not disclose when or from whom he had purchased the rugs. The book entries were completely unauthenticated. The lack of supporting records made it impossible to determine the accuracy of those entries so as to prevent the possible perpetration of fraud on the insurance carrier." The decision in the *Sirhan* case has no applicability to the facts in the case before us.

Here, the plaintiff testified that records were kept of merchandise bought and sold by him "from the very beginning", that he was required to do so by O.P.A. regulations and by the Atlantic Refining Company, from which he purchased his service station supplies, and to have the records available for periodic inspection. He testified: "And also we kept a list of merchandise bought other than gasoline and oil from Atlantic. The sporting goods that was kept in a separate book along with our checks, invoices, and so forth. . . . We did keep records of everything . . ." Mrs. Haizlett, who kept the books for the business, gave positive and detailed testimony relative to the records and books which she kept, which included invoices, receipts, sales slips, cancelled checks and vouchers. This testimony, if believed, justifies her statement that she kept "complete records", and from its verdict it must be assumed

that the jury believed the testimony of the plaintiff and his wife and found *as a fact* that a system of books and accounts as contemplated by the contract had been kept by the plaintiff. Certainly there is nothing in the record in this case which would warrant us in holding that, *as a matter of law,* the "books and accounts" of the plaintiff were not kept in compliance with the provision of the policy.

The evidence as to forcible and felonious entry is voluminous. Plaintiff, his employe Anderson, his son Gerald, the constable Murdock, State Policeman Charles E. Brown who investigated the burglary about three days later, and Mrs. Haizlett all testified as to the "bent" condition of bars and as to marks and indentations made on the large overhead door opening on the grease rack. As described by Private Brown, the marks and indentations were "approximately an inch and a half up into the door", "right on the bottom edge", and a "quarter of an inch or half inch" deep. Murdock, who was on the scene immediately when plaintiff discovered the burglary, testified that "these rods that run out from the center of the door to fasten the door . . . were bent and they stood out from the door possibly five or six inches". Anderson testified that he later repaired the bars, which put him in position "why I can tell you in detail how they were bent". Gerald Haizlett, after describing the condition of the door in great detail both on direct and cross-examination, testified that he "tried to lock it but they wouldn't lock it until we bent it a little bit more than it was. In order to lock up that night we had to bend them in." No useful purpose would be served by setting forth in detail all the testimony of the various witnesses as to the evidence of forcible entry; suffice it to say that it was all in substantial agreement, and after a lapse of almost six years, it is not surprising that estimates of

length and depth of the impressions on the door varied slightly. We are concerned only and primarily with the sufficiency of the evidence to support the jury's verdict, and for this purpose we have here credible, sustaining evidence.

Judgment affirmed.